Filed 3/23/16  In re D.W. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re D.W., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>U.S.,<br><br>        Defendant and Appellant. | A145286<br><br>(Alameda County Super. Ct. No. OJ10016173) |

U.S. (Mother), mother of five-year-old D.W., appeals from the juvenile court's jurisdictional and dispositional orders placing D.W. with his father, D.W. (Father), with family maintenance services to Father, and no services to Mother.  She contends the court erred in denying her services.  Alameda County Social Services Agency (the Agency) argues the appeal must be dismissed as moot because it is now informally providing Mother with services.[1]  The Agency alternatively argues the orders should be affirmed

---

[1] The Agency requests that we consider postjudgment evidence that shows it is now providing Mother with informal services, and argues the appeal is moot in light of this new development.  Mother opposes the request and argues the appeal is not moot because the juvenile court's order denying her services "still stands."  We agree that the Agency's act of informally providing services without a court order does not render the instant appeal moot.  Further, because the postjudgment evidence was not before the

1

because there was no error.  We address the merits of Mother's appeal and affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

*Original petition*

An original dependency petition was filed on December 28, 2010, alleging that newborn baby D.W. was at substantial risk of serious harm due to Mother's refusal to bond with him, and because of her mental health history and lack of support system.  The petition further alleged that Mother had failed to bond with D.W.'s half sibling, T.M., and that her parental rights to T.M. had been terminated.

According to the detention report, Mother was in foster care as a minor, from 1994 until she was emancipated in 2005.  Beginning in 2006, she was involved with child welfare services as the mother of T.M.  There were several substantiated reports of general neglect of T.M. and a substantiated report that she physically abused T.M.  Mother did not cooperate with informal or reunification services during T.M.'s dependency case, and her parental rights to T.M. were terminated.

The detention report stated that Mother did not appear to be bonding with D.W.  She declined to have him in the hospital room overnight and had attended only five prenatal appointments during her pregnancy.  Father was present at the hospital the day after D.W. was born and signed a Declaration of Paternity form.  His name was to appear on D.W.'s birth certificate, and he was willing and able to provide for D.W.

As to Mother's mental health history, an evaluating psychiatrist believed, "based on his observation of [Mother's] disorganized thinking where she wanders from thought to thought," that "there is a possible psychosis."  She had been involuntarily held under Welfare and Institutions Code, section 5150,[2] in August 2007, and her moods were often

---

juvenile court and no extraordinary circumstances are presented, we deny the Agency's request.  (*In re Zeth S.* (2003) 31 Cal.4th 396, 400, 405; *In re Robert A.* (2007) 147 Cal.App.4th 982, 990.)

[2]All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2

volatile.  A social worker observed Mother displaying obsessive compulsive behaviors such as taking very long showers several times a day, repeatedly washing her hands, and being particular about the type of cup and toothbrush she used.  Mother did not appear to understand why the Agency needed to be involved, and declined referrals to the Healthy Start Program.

On December 29, 2010, the juvenile court ordered D.W. detained and granted the Agency discretion to release him to Father.

According to a January 11, 2011 jurisdictional and dispositional report, D.W. was doing very well in Father's care.  Father was working hard to establish services for D.W. and had followed through with every referral he had been given.  He had a criminal arrest record dating back to 1997 for theft and drug related charges, and it appeared he had spent some time in prison for his crimes.  His last arrest, which did not result in charges being filed, occurred in 2004.  He had two children from a previous relationship and shared custody of them.  He was employed, lived in a three-bedroom apartment rental, and had a large extended family network and a solid support system.  The Agency believed D.W. "will do just fine" in Father's care, and that no further Agency intervention was necessary.  It recommended that jurisdiction be established, that custody orders be made maintaining D.W. with Father, and that the case be dismissed.  Mother had not been in contact with the Agency, had not asked for visitation, and had not expressed an interest in parenting D.W.  Father reported that Mother brought cereal for D.W. and had been in contact with him regarding D.W.'s well being.

At a February 4, 2011 jurisdictional and dispositional hearing, the juvenile court adopted the Agency's recommendations.  It found true the allegations of the petition, removed D.W. from Mother's custody, ordered him placed in Father's custody with full legal and physical custody to Father, and dismissed jurisdiction.  The court awarded supervised visits to Mother.

### Current Petition

The Agency filed a new petition on February 4, 2015, alleging D.W. was at substantial risk of serious harm because witnesses observed Mother hitting him multiple

3

times in the head and body, causing bruising above the right corner of his right eye, two abrasions on his forehead, and an abrasion on the back of his neck. Mother appeared to be under the influence of a stimulant, as she was "very animated with rapid speech, struggling to keep still, hand/body movements were continuous and 'very hyperreflexic,' could not stop licking her lips and moving her jaw, suffering from 'involuntary twitching,' [and] dilated pupils." She was arrested and charged with child abuse (Pen. Code, § 273, subd. (d)) and was in jail in Richmond, California. D.W. was with Mother at the time because Father had left him with her for approximately two months while he lived in a men's shelter that could not accommodate children. D.W. appeared to be developmentally delayed in his speech as he was not able to speak in complete sentences. The petition further alleged that Mother's parental rights to D.W.'s half-sibling, T.M., had been terminated.

A February 5, 2015 detention report stated that D.W. was living in a foster home. According to a police report, witnesses observed Mother hitting D.W. while he was in his stroller, causing him to fall onto the sidewalk. She continued striking D.W. in his head and body, five to ten times, as he lay on the sidewalk. Police arrived and noted that Mother appeared to be under the influence of a stimulant. Mother admitted she was treating D.W. inappropriately and went too far, but denied abusing him. Father was living in a men's shelter that did not accommodate children, and was on the wait list for a family unit. Father said he allowed Mother to care for D.W. for the past two months because of his living situation, and because he lacked daycare during working hours. He did not think Mother would hurt D.W. D.W.'s godmother told the Agency that D.W. had been staying with Mother and that Father was not D.W.'s primary caregiver. She said that Mother "may come across as being under the influence" even though she is not. In "all the years she has known [Mother]," she had not seen Mother using drugs. The godmother believed Mother had developmental issues and might benefit from Regional Center Services. The godmother wished to be considered for placement, and said there was a maternal aunt who also wished to be considered. The Agency recommended that D.W. remain in foster care until Father obtained family housing.

4

Mother was incarcerated and did not appear at the February 5, 2015 detention hearing. The juvenile court ordered D.W. removed from his parents' custody, granted the Agency discretion to release D.W. to Father, and scheduled a jurisdictional and dispositional hearing for February 19, 2015.

According to a February 19, 2015 jurisdictional report, Father still lacked housing that could accommodate D.W. but had a meeting with his counselor scheduled that day to determine if he could move into a family unit. The Agency recommended that the court take jurisdiction and continue disposition. Mother did not appear at the hearing and the matter was continued.

According to a March 6, 2015 dispositional report, the Agency recommended that D.W. be placed out of the home, with family reunification services to Father and no reunification services to Mother. The Agency was unable to place D.W. with Father because Father had not yet obtained family housing. It recommended that D.W. remain in foster care until Father obtained proper housing, or until a relative placement was approved. A social worker who observed a visit between Father and D.W. believed Father was appropriate at the visit and that supervised visits were therefore unnecessary. The social worker also reported that when she saw Father at a bus stop after the visit and offered him a ride, he smelled of marijuana, which led her to believe he smoked marijuana after the visit, on his way to the bus stop. The Agency set forth in the report some issues it faced while trying to set up visits for Father. The Agency recommended no services for Mother due to her physical discipline of D.W., her history of using corporal punishment on T.M., and the fact that her parental rights to T.M. had been terminated.

Both parents contested the Agency's recommendations, and a contested jurisdictional and dispositional hearing was scheduled for May 21, 2015. In an addendum report, the Agency stated that Father was temporarily living in a motel and that CalWorks Housing Program was going to pay for the motel stay for as long as it was needed, and thereafter assist him with rent, deposit, and furnishings once he moved into an apartment. Based on the new living situation, the Agency placed D.W. with Father on

5

March 28, 2015, and referred him to therapy, child care, and other services. Mother had been convicted of two misdemeanor counts of battery (Pen. Code, § 242) and assault (Pen. Code, § 240) stemming from her abuse of D.W. The Agency recommended that D.W. be placed with Father, with family maintenance services to Father and no services to Mother.

Mother testified at the May 21, 2015 jurisdictional and dispositional hearing. She acknowledged she was found guilty of assault and battery against D.W. but denied hitting him. She said she was struggling to strap D.W. into his stroller when he resisted by kicking and moving her hands away. She testified that Father provided a home for D.W. but that she had also spent practically every day with D.W. since 2011, until she was arrested on February 2, 2015. In 2013, D.W. lived with Father and she saw him everyday for four or five hours a day. In 2014, D.W. lived with Father, and she saw him everyday, from 9:00 a.m. to 9:00 p.m. In 2015, D.W. stayed with Mother on the weekdays, and she would take him to Father to visit when Father was able to care for him. D.W. also spent some weekends at his godmother's house. At the time of the hearing, Mother was living in a shelter. She had not made an effort to see D.W. since being released from jail but wished to see him again and to spend more time with him. Her understanding of the previous custody order was that she could have visitation with D.W. as frequently as she wanted with Father's permission. She did not recall whether the visits had to be supervised.

Mother acknowledged that T.M. was removed from her care and that her parental rights to T.M. were terminated. She believed the allegation as to T.M. was that she "tried to shove food down [T.M.'s] throat," when in fact, she was "just trying to feed her some real food." She testified she never received any reunification services in T.M.'s case. She did not know why D.W. was removed from her care in 2010, except that she was told she was "not holding [him] right in the hospital and some other stuff." She had not taken a parenting class on her own since the conclusion of T.M.'s case. She had not engaged in individual or family counseling. She had not followed any medication regiment, had not been in substance abuse treatment, and had not been evaluated for mental health-related

6

issues. When asked whether she would take a parenting class if the Agency asked her to take one, she responded, "But I didn't abuse my child or hit him." When asked whether she would take a parenting class if ordered by the court to do so, she stated she would, if it allowed her increased visitation with D.W. When asked whether she would undergo a psychological evaluation if ordered by the court to do so, she responded, "I don't think that's necessary." She testified she had trouble "visualizing things" and was receiving supplemental security income for the condition, which she understood was a learning disability.

The juvenile court found true the allegations in the petition as amended, i.e., that D.W. was a child described by section 300, subdivisions (a), (b), and (j). Before ruling on disposition, the court asked the parties "to focus their remarks on bypass and" and expressed its concern "that there may be a significant bond" between Mother and D.W., "for better or for worse." "The mother's initial examination taught us all that I think the minor and the mother have been spending more time together than was contemplated back in 2011. That's an appropriate consideration for the Court in considering whether or not best interest would cause the Court to direct that services be provided to the mother even in a Family Maintenance situation despite adequate proof of supporting bypass."

The Agency stated it was recommending "Family Maintenance with the father" and that Mother was therefore "not entitled to reunification services." The Agency stated it would not offer her services because "two bypass provisions apply"—section 361.5, subdivisions (b)(10) and (b)(11). The Agency further stated, "although she has spent time with him, her actions on that day show that it is perhaps not in [D.W.'s] best interest to be with his mother and that the Family Maintenance relationship with the father is more important to [D.W.] at this time." Minor's counsel concurred that "the provision of child welfare services would be futile," based on her unwillingness to participate in services, and because she did not appear to understand what she had done wrong. Counsel recommended therapeutic visits, stating, "Even without informal child welfare services, visitation can be arranged by the Agency to maintain that relationship."

7

Father's counsel noted that D.W. is very bonded with Mother; he called her mommy and mom and always asked for her. Counsel believed Mother was "not a lost cause" and should be "given another opportunity to parent her child." Mother's counsel also noted that Mother had been very active in parenting D.W. and had a relationship with him. Counsel stated, "It is probably in [D.W.'s] best interest to get all of the help that he can get for his mother so that relationship can be as healthy as possible. So we would urge the Court to make a finding that [Mother] is entitled to services; and most importantly from [her] standpoint, she wants her visitation with her child to be as liberal as the Court can see its way clear to grant."

The Agency's attorney stated in rebuttal: "The Agency joins in minor's counsel's argument regarding whether services would be in the best interest of [D.W.] considering the mother's lack of beginning to participate in these services. If the problems that are leading to removal do deal with a cognitive delay or mental health issue and the mother continues to deny receiving treatment for that issue, it would not be in [D.W.'s] best interest to provide services."

The juvenile court ordered D.W. placed with Father with family maintenance services for Father. It stated, "I do find that there is clear and convincing evidence that reunification services should be denied to the mother . . . pursuant to Section 361.5 subdivision (b)(11). [¶] The parental rights of the mother were terminated as to a half sibling . . . and [D.W.] is being removed from the custody of the mother who has not made a reasonable effort to treat the problems that led to the removal of the half-sibling." The court ordered that "visits begin with therapeutic visits arranged through and by the Agency as part of the minor's case plan." The court then stated, "I will indicate also for the record that I considered whether there was a best-interest exception that might apply. I was concerned about the amount of time that the minor spent with the mother; but from the information that I gleaned, I cannot conclude that even with the amount of time that they spent together that the best interest exception would cause the Court to order something different concerning services to the mother. I have no information about the

8

quality of the care that was provided during those time periods." The court scheduled a future family maintenance review hearing for October 29, 2015. Mother timely appealed.

## DISCUSSION

Mother contends the juvenile court erred in denying her services. Specifically, she asserts the court lacked authority to deny services under section 361.5, which applies to situations in which a child is removed from both parents, and that it should instead have evaluated the issue of services under section 362, which applies to situations in which a dependent child remains in the custody of a parent. She argues that under section 362, she was entitled to services. We conclude the court improperly stated it was denying services under section 361.5, but that the error was harmless as the record supports the denial of services to Mother.

Section 361.5, subdivision (a), provides that unless certain exceptions apply, "whenever a child is removed from a parent's . . . custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother and statutorily presumed father or guardians." "Child welfare services" include both reunification services and family maintenance services. (*In re Pedro Z.* (2010) 190 Cal.App.4th 12, 19–20 (*Pedro Z.*).) Section 361.5 applies only *when the child has been removed and placed in out-of-home care, not when the child is placed with a parent*. (*Id.* at p. 19 [§ 361.5's provision for family reunification "does not apply when, at the disposition hearing, a child does not enter foster care, but is returned to a parent"]; *Bridget A. v Superior Court* (2007) 148 Cal.App.4th 285, 303 [when a child remains in the home of a parent, the proper form of child welfare services is family maintenance services, not reunification services].) This is because, when a child is safely in the custody of one parent, "the court is not concerned with reunification, but with determining whether continued supervision is necessary in the family home." (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 650.)

When a child is adjudged a dependent but is placed in the custody of a parent, the applicable statutory provision is section 362, subdivision (c), which provides: "If a child is adjudged a dependent child of the court, on the ground that the child is a person

9

described by Section 300, and the court orders that a parent . . . shall retain custody of the child subject to the supervision of the social worker, the parents . . . shall be required to participate in child welfare services or services provided by an appropriate agency designated by the court." The services referred to in section 362 are not reunification services, but family maintenance services, which are provided "in order to maintain the child in his or her own home." (§ 16506; *Pedro Z.*, *supra*, 190 Cal.App.4th at pp. 19–20.) Section 362, by its terms, vests the juvenile court with discretion to order whatever family maintenance services it deems "necessary and proper," including counseling and education programs. (§ 362, subd. (d).) This language affords the court "broad discretion to determine what would best serve and protect the child's interests and to fashion its dispositional order accordingly." (*In re A.E.* (2008) 168 Cal.App.4th 1, 4; *In re A.L.* (2010) 188 Cal.App.4th 138, 145.) In reviewing an order for abuse of this broad discretion, we view all the evidence and draw all reasonable inferences in favor of the court's ruling. (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 186–187.) We affirm the order unless no rational trier of fact could determine that the juvenile court's order advanced the best interests of the child. (*Ibid.*)

Here, the applicable statutory provision was section 362, not section 361.5, because the juvenile court adjudged D.W. a dependent of the court and placed him in Father's custody, with family maintenance services. (*In re A.C.* (2008) 169 Cal.App.4th 636, 650 ["if minors remain in the custody of a parent, section 361.5 plays no role"].) Thus, the court erred when it stated it was denying "reunification services" to Mother under section 361.5, subdivision (b)(11),[3] due to her failure to reunify with D.W.'s half sibling and her failure to make a reasonable effort to treat the problems that led to the half

---

[3]Section 361.5, subdivision (b)(11), provides that "[r]eunification services need not be provided to a parent . . . when the court finds, by clear and convincing evidence," "[t]hat the parental rights of a parent over any sibling or half sibling of the child had been permanently severed, and this parent is the same parent described in subdivision (a), and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent."

sibling's removal. Instead, the court should have exercised its discretion under section 362 in determining whether to order any "necessary and proper" services to Mother that would "best serve and protect [D.W.'s] best interests." (*In re A.E., supra*, 168 Cal.App.4th at p. 4.)

The juvenile court's reference to the bypass provision of section 361.5, however, was harmless error because the record, as a whole, supports the conclusion that the court also properly determined, more generally, that ordering services to Mother would not be in D.W.'s best interests. First, the court expressed its concern regarding a possible "significant bond" between Mother and D.W. It acknowledged Mother had spent more time with D.W. than was contemplated in 2011, and that this was an "appropriate consideration for the Court in considering whether or not best interest would cause the Court to direct that services be provided to the mother even in a Family Maintenance situation despite adequate proof of supporting bypass."

Second, during argument, all parties addressed whether services would be in D.W.'s best interests. For example, although the Agency relied on the bypass provisions of section 361.5 in arguing that services to Mother should be denied, it also argued that despite the amount of time Mother had spent with D.W., "her actions on that day [that resulted in misdemeanor convictions for assault and battery for Mother] show that it is perhaps not in [D.W.'s] best interest to be with his mother and that the Family Maintenance relationship with the father is more important to [D.W.] at this time." The Agency also argued that services would not be in D.W.'s best interests considering Mother's lack of willingness to participate in services and her refusal to receive treatment for any possible cognitive delays or mental health issues. Minor's counsel concurred that "the provision of child welfare services would be futile," based on Mother's unwillingness to participate in services, and because she did not appear to understand what she had done wrong. Father's counsel and Mother's counsel both argued that D.W. was bonded with Mother and that it was in his best interest for her to receive services so that they could have a healthy relationship.

11

The record reveals that the juvenile court considered all of these arguments and evaluated whether it was in D.W.'s best interests to order services for Mother. The court stated it had considered the amount of time D.W. had spent with Mother, and whether "there was a best-interest exception that might" justify an order for services to Mother. It then stated that based on the limited information it had received regarding the quality of care that Mother provided to D.W. during the time they had spent together, it did not believe that the best interests of D.W. warranted a "different" "order . . . concerning services to the mother." In light of Mother's failure to reunify with D.W.'s sibling, her inability to recognize her issues, her indicated unwillingness to participate in certain services, and the limited information that was presented regarding the quality of care she provided to D.W. and the bond they shared, it is not reasonably probable the result would have been different had the court exercised its broad discretion under section 362 instead of section 361.5.[4] (See *In re Celine R.* (2003) 31 Cal.4th 45, 50 [an error is harmless when "it is not reasonably probable the result would have been different had the court [not erred]".)

## DISPOSITION

The jurisdictional and dispositional orders are affirmed.

---

[4]Mother asserts, "Should this court allow the introduction of post-hearing developments, it must consider" the fact that an order for services has become "even more critical" now, due to incidents that have occurred since disposition. We decline to address such new evidence. (*In re Zeth S.*, *supra*, 31 Cal.4th at pp. 400, 405; *In re Robert A.*, *supra*, 147 Cal.App.4th at p. 990.) "[D]ependency cases by their nature are not static, and, because circumstances can change dramatically, the court must make its orders based on the circumstances existing at the time of the hearing." (*In re K.B.* (2009) 173 Cal.App.4th 1275.) We expect the juvenile court will issue any orders as appropriate based on information available to it at the time future hearings take place.

12

_____
McGuiness, P.J.

We concur:


_____
Pollak, J.


_____
Siggins, J.


A145286

13